REVISED - August 19, 1999

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

No. 97-30879 & No. 98-30132
_____

HERB FREILER; SAM SMITH, Individually and in his capacity as
Administrator of the Estate of his minor child Steven Smith; JOHN
JONES,

Plaintiffs-Appellees,

v.

TANGIPAHOA PARISH BOARD OF EDUCATION; E.F. BAILEY; ROBERT CAVES;
MAXINE DIXON; LEROY HART; RUTH WATSON, DONNIE WILLIAMS, SR.; ART
ZIESKE, Individually and in their capacities as members of the
School Board; TED CASON, Individually and in his capacity as
Superintendent of Schools,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____

August 13, 1999

Before KING, Chief Judge, and POLITZ and BENAVIDES, Circuit
Judges.


BENAVIDES, Circuit Judge:

        Parents of children in the Tangipahoa Parish Public Schools

brought this suit to enjoin their school board from mandating

that a disclaimer be read immediately before the teaching of

evolution in all elementary and secondary classes.  The district

court held that the disclaimer constituted an establishment of

religion in violation of the First Amendment.  We affirm.

I.

The teaching of evolution has created controversy for many years in the Tangipahoa Parish Public Schools ("TPPS"). Following a failed attempt to introduce creation science into the Tangipahoa curriculum as a legitimate scientific alternative to evolution, the Tangipahoa Parish Board of Education ("School Board" or "Board") adopted a resolution disclaiming the endorsement of evolution.[1] The resolution, which passed by a 5-4 vote of the School Board on April 19, 1994, reads:

> Whenever, in classes of elementary or high school, the scientific theory of evolution is to be presented, whether from textbook, workbook, pamphlet, other written material, or oral presentation, the following statement shall be quoted immediately before the unit of study begins as a disclaimer from endorsement of such theory.
>
> It is hereby recognized by the Tangipahoa Board of

_____

[1]The passage of the disclaimer was not the first action by the School Board concerning the teaching of evolution. In December 1993, a member of the School Board proposed a <u>Policy on the Inclusion of Religious Material and Discussions on Religion in the Curriculum and in Student Activities</u> ("Policy"). That same member later proposed a <u>Revised Draft of Policy</u> ("Revised Policy"). These policies would have allowed the teaching of alternative theories of the origin of mankind, including Creation science. Even though it was defeated in Committee, the Revised Policy was discussed at a March 1994 School Board meeting. During that meeting, the Board rejected two items in the Revised Policy concerning the study of creation science and a graduation ceremony prayer.
    The Board passed four other items included in the Revised Policy. Those items provided that (1) no religious belief or non-belief should be promoted or disparaged by the school system; (2) religious materials may be included in secular education (e.g. literature, art, humanities, etc.); (3) artistic expressions (e.g. music, art, etc.) could have religious themes if they were presented objectively; and (4) students could distribute religiously oriented materials as long as students followed the school's rules pertaining to content-neutral time, place, and manner restrictions.

Education, that the lesson to be presented, regarding the origin of life and matter, is known as the Scientific Theory of Evolution and should be presented to inform students of the scientific concept and not intended to influence or dissuade the Biblical version of Creation or any other concept.

It is further recognized by the Board of Education that it is the basic right and privilege of each student to form his/her own opinion and maintain beliefs taught by parents on this very important matter of the origin of life and matter. Students are urged to exercise critical thinking and gather all information possible and closely examine each alternative toward forming an opinion.

Preceding the adoption of the resolution, School Board members and parents who were present at the April 19, 1994, meeting discussed the language of the disclaimer. In particular, debate centered on the inclusion of the phrase "Biblical version of Creation." A School Board member, Logan Guess, voiced concerns that the reference to the Bible excluded non-Christian viewpoints from the disclaimer. He argued that, even though the disclaimer also included the phrase "or any other concept," School Board members were concerned only with declining to endorse evolution because of its inconsistency with the Biblical version of creation. Bailey, the board member who proposed the disclaimer, justified including the phrase, arguing that because "there are two basic concepts out there" (presumably creation science and evolution), and because he believed that "perhaps 95 percent" of the community "fall into the category of believing [in] divine creation," the Board should not "shy away, or hide away from saying that this is not to dissuade from the Biblical version." In his closing remarks immediately before the Board

3

voted to adopt the disclaimer, Bailey further suggested that evolution theory as taught in science class should not be confused with fact and that the School Board should explicitly decline to endorse evolution theory because of its inconsistency with the faith of the larger community.

On November 7, 1994, approximately seven months after the resolution passed, several parents of children in the TPPS brought suit in the U.S. District Court for the Eastern District of Louisiana, challenging the validity of the disclaimer under provisions in the United States and Louisiana constitutions barring laws "respecting an establishment of religion."[2] U.S. Const. amends., I, XIV; La. Const. art. I, sec. 8. The district court concluded that the resolution was devoid of secular purpose and therefore ran afoul of the first prong of the three-part test of Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971). In reaching this conclusion, the district court discredited the School Board's assertion that its secular purpose in adopting the disclaimer was to promote critical thinking and information gathering by students on the subject of the origin of life. The court noted that School Board members did not mention this purported purpose during the adoption debate and that the

---

[2]The First Amendment of the United States Constitution in relevant part provides: "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof...." This prohibition is applicable to the states through the Fourteenth Amendment. See Stone v. Graham, 449 U.S. 39, 41 n. 2, 101 S. Ct. 192, 193 n. 2 (1980); School District of Abington v. Schempp, 374 U.S. 203, 215-16, 83 S. Ct. 1560, 1567-68 (1963).

Tangipahoa Parish Public Schools already encouraged students to think critically about all issues before the adoption of the disclaimer. The district court found that the statements made by School Board members both during the adoption debate and while testifying at trial revealed that the disclaimer, in fact, had a religious purpose--i.e., to satisfy the religious concerns of the majority that the teaching of evolution in public school contradicted lessons taught in Sunday school. Accordingly, the court held the resolution invalid under the federal and state constitutions and enjoined the reading of the disclaimer. The School Board and the named individual defendants then brought this appeal.

## II

The sole issue for our resolution is whether the specific disclaimer adopted by the Tangipahoa Parish Board of Education contravenes the First Amendment. We limit our analysis to the precise language of the disclaimer and the context in which it was adopted. We do not confront the broader issue of whether the reading of any disclaimer before the teaching of evolution would amount to an unconstitutional establishment of religion.

States and their duly authorized boards of education have the right to prescribe the academic curricula of their public school systems. Courts therefore must exercise great "care and restraint" when called upon to intervene in the operation of public schools. Epperson v. Arkansas, 393 U.S. 97, 104, 89 S. Ct. 266, 270 (1968). Given, however, that the "vigilant

5

protection of constitutional freedoms" is nowhere more vital than in American public education, id., 89 S. Ct. at 270, the right to prescribe public school curriculum must of necessity be limited in scope. States may not require that teaching and learning be tailored to the principles or prohibitions of any religious sect or dogma. See id. at 106, 89 S. Ct. at 271.

In the context of public education, we have evaluated state action challenged on Establishment Clause grounds under each of "three complementary (and occassionally overlapping) tests" established by the Supreme Court. Doe v. Santa Fe Independent School District, 168 F.3d 806, 816 (5th Cir. 1999). The first test, and the one of longest lineage, is the disjunctive three-part Lemon test, under which a state practice is unconstitutional if (1) it lacks a secular purpose; (2) its primary effect either advances or inhibits religion; or (3) it excessively entangles government with religion. See Lemon, 403 U.S. at 612-613, 91 S. Ct. at 2111. The second test, commonly referred to as the endorsement test, seeks to determine whether the government endorses religion by means of the challenged action. See, e.g., County of Allegheny v. ACLU, 492 U.S. 573, 594, 109 S. Ct. 3086, 3101 (1989) (holding that the display of a creche on the Grand Staircase of the Allegheny County Courthouse violated the First Amendment but that the display of a menorah as part of a secular exhibit was constitutional). The government unconstitutionally endorses religion when it "conveys a message that religion is 'favored,' 'preferred,' or 'promoted' over other beliefs." Id.

6

at 593, 109 S. Ct. 3086.  Finally, the third test, aptly named the coercion test, analyzes school-sponsored religious activity in terms of the coercive effect that the activity has on students.  See, e.g., Lee v. Weisman, 505 U.S. 577, 112 S. Ct. 2649 (1992) (holding unconstitutional a school district's policy permitting school principals to invite clergy to give "nonsectarian" invocations and benedictions at graduation ceremonies).  Under this test, school-sponsored activity contravenes the First Amendment when "(1) the government directs (2) a formal religious exercise (3) in such a way as to oblige the participation of objectors."  Jones v. Clear Creek Independent School District, 977 F.2d 963, 970 (5th Cir. 1992) ("Clear Creek II") (citation omitted).

Our multi-test analysis in past cases has resulted from an Establishment Clause jurisprudence rife with confusion and from our own desire to be both complete and judicious in our decision-making.  See, e.g., Doe ex rel. Doe v. Beaumont Independent School District, 173 F.3d 274, 295 (5th Cir.) (analyzing school district's "Clergy in Schools" volunteer counseling program utilizing Lemon, endorsement, and coercion tests), on reh'g en banc, ___ F.3d ___ (1999); Ingebretsen v. Jackson Public School District, 88 F.3d 274, 280 (5th Cir. 1996) (examining state statute permitting public school students to initiate nonsectarian, nonproselytizing prayer at compulsory and noncompulsory school events pursuant to the Lemon, endorsement, and coercion tests); Clear Creek II, 977 F.2d 963, 966-969, 972

7

(employing <u>Lemon</u>, endorsement, and coercion analysis to uphold a school district resolution permitting public high school seniors to choose student volunteers to deliver nonsectarian, nonproselytizing invocations at graduation ceremonies).  Nothing in our Circuit's case law requires that contested government action be examined under each Supreme Court-delineated test.  <u>Cf.</u> <u>Santa Fe Independent School District</u>, 168 F.3d at 818 (explaining that, because student-selected, student-given, sectarian, proselytizing invocations and benedictions violate the <u>Lemon</u> test and the endorsement test, analysis under the coercion test was not necessary); <u>Helms v. Picard</u>, 151 F.3d 347, 362 (5th Cir. 1998) (analyzing a school aid program in accordance with only the <u>Lemon</u> test), <u>cert. granted</u> <u>sub nom.</u>, <u>Mitchell v. Helms</u>, No. 98-1648, 1999 WL 231469 (U.S. Jun. 14, 1999).  The decision to apply a particular Establishment Clause test rests upon the nature of the Establishment Clause violation asserted.  Where, as in the instant action, the practice at issue does not direct student participation in a formal religious exercise, we elect not to apply the coercion test.

III

Although widely criticized and occasionally ignored, the <u>Lemon</u> test continues to govern Establishment Clause cases.  In <u>Agostini v. Felton</u>, 521 U.S. 203, 117 S. Ct. 1310 (1997), the Supreme Court laid to rest rumors of the <u>Lemon</u> test's demise when it exclusively applied <u>Lemon</u> analysis to a school aid program. The Court acknowledged the continued viability of the general

8

<u>Lemon</u> principles used to evaluate whether government action violates the Establishment Clause and noted in particular that the nature of the inquiry under <u>Lemon</u>'s purpose prong has "remained largely unchanged." <u>Id.</u> at 223, 117 S. Ct. at 2010.

A.

The first prong of the <u>Lemon</u> test requires that challenged state action have a secular purpose. <u>See</u> <u>Lemon</u>, 403 U.S. at 612, 91 S. Ct. at 2111. <u>Lemon</u>'s first prong does not require that challenged state action have been enacted in furtherance of exclusively, or even predominately, secular objectives. <u>See</u> <u>Wallace v. Jaffree</u>, 472 U.S. 38, 56, 105 S. Ct. 2479, 2489 (1985) (explaining that a statute motivated in part by a religious purpose may satisfy <u>Lemon</u>'s purpose prong). In order for state activity to pass muster under <u>Lemon</u>'s first criterion a sincere secular purpose for the contested state action must exist; even if that secular purpose is but one in a sea of religious purposes. <u>See</u> <u>id.</u> at 56, 105 S. Ct. at 2489.

The School Board has articulated three distinct, albeit intertwined, purposes for the contested disclaimer. According to the Board, the disclaimer serves (1) to encourage informed freedom of belief, (2) to disclaim any orthodoxy of belief that could be inferred from the exclusive placement of evolution in the curriculum, and (3) to reduce offense to the sensibilities and sensitivities of any student or parent caused by the teaching of evolution.

We treat the School Board's three-fold articulation of

9

purpose with deference.  See Santa Fe Independent School District, 168 F.3d at 816.  Deference, however, ought not be confused with blind reliance.  Accordingly, we examine each of the disclaimer's avowed purposes to ensure that the purpose is sincere and not a sham.  See id. (citing Edwards v. Aquillard, 482 U.S. 578, 586-87, 107 S. Ct. 2573, 2579 (1987)).  In undertaking such a "sham" inquiry, we consider whether the disclaimer furthers the particular purposes articulated by the School Board or whether the disclaimer contravenes those avowed purposes.  See Aquillard, 482 U.S. at 589, 107 S. Ct. at 2580 (finding purported purpose of protecting academic freedom to be insincere in light of the fact that "the Act does not serve to protect academic freedom, but has the distinctly different purpose of discrediting evolution").  If the disclaimer furthers just one of its proffered purposes and if that same purpose proves to be secular, then the disclaimer survives scrutiny under Lemon's first prong.

We find that the contested disclaimer does not further the first articulated objective of encouraging informed freedom of belief or critical thinking by students.  Even though the final sentence of the disclaimer urges students "to exercise critical thinking and gather all information possible and closely examine each alternative toward forming an opinion," we find that the disclaimer as a whole furthers a contrary purpose, namely the protection and maintenance of a particular religious viewpoint.  In the first paragraph to be read to school children, the

10

Tangipahoa Board of Education declares that the "Scientific Theory of Evolution . . . should be presented to inform students of the scientific concept" but that such teaching is "not intended to influence or dissuade the Biblical version of Creation or any other concept."  From this, school children hear that evolution as taught in the classroom need not affect what they already know.  Such a message is contrary to an intent to encourage critical thinking, which requires that students approach new concepts with an open mind and a willingness to alter and shift existing viewpoints.  This conclusion is even more inescapable when the message of the first paragraph is coupled with the statement in the last that it is "the basic right and privilege of each student to . . . maintain beliefs taught by parents on [the] . . . matter of the origin of life . . . ."  We, therefore, find that the disclaimer as a whole does not serve to encourage critical thinking and that the School Board's first articulated purpose is a sham.

We find that the disclaimer does further the second and third purposes articulated by the School Board.  The disclaimer explicitly acknowledges the existence of at least one alternative theory for the origin of life, i.e., the Biblical version of creation.  Additionally, the disclaimer reminds school children that they can rightly maintain beliefs taught by their parents on the subject of the origin of life.  We have no doubt that the disclaimer will further its second and third avowed objectives of disclaiming any orthodoxy of belief that could be implied from

11

the exclusive place of evolution in the public school curriculum and reducing student/parent offense caused by the teaching of evolution. Accordingly, we conclude that these two purposes are sincere.

We next consider whether disclaiming orthodoxy of belief and reducing student/parent offense are permissible secular objectives. In conducting this inquiry, we are mindful that a purpose is no less secular simply because it is infused with a religious element. Cf. Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 335, 107 S. Ct. 2862, 2868 (1987) (explaining that the Lemon test, requiring that the law at issue serve some secular legislative purpose, does not require that the contested law's purpose be unrelated to religion); Lynch v. Donnelly, 465 U.S. 668, 673, 104 S. Ct. 1355, 1359 (1984) (noting that the Constitution "affirmatively mandates accommodation, not merely tolerance, of all religions . . . . Anything less would require the 'callous indifference' we have said was never intended"). For this reason, the fact that evolution, the subject about which the School Board sought to disclaim any orthodoxy of belief, is religiously charged, see Aquillard, 482 U.S. at 593, 107 S. Ct. at 2582 (noting that evolution is the one scientific theory that historically has been opposed by certain religious sects), and the fact that the sensitivities and sensibilities to which the School Board sought to reduce offense are religious in nature, does not per se establish that those avowed purposes are

12

religious purposes.

In order to avoid the "callous indifference" first cautioned against by the Supreme Court in Zorach v. Clauson, 343 U.S. 306, 314, 702 S. Ct. 679, 684 (1952), we conclude that, under the instant facts, the dual objectives of disclaiming orthodoxy of belief and reducing student/parent offense are permissible secular objectives that the School Board could rightly address. Cf. Bethel School District No. 403 v. Fraser, 478 U.S. 675, 681, 106 S. Ct. 3159, 3163 (1986) (noting that, in the context of a civil rights action, fundamental values essential to a democratic society include "tolerance of divergent political and religious views" and "consideration of the sensibilities of others, and, in the case of a school, the sensibilities of fellow students"). In so doing, we acknowledge that local school boards need not turn a blind eye to the concerns of students and parents troubled by the teaching of evolution in public classrooms.

B.

Lemon's second prong asks whether, irrespective of the School Board's actual purpose, "the practice under review in fact conveys a message of endorsement or disapproval." Doe v. Santa Fe Independent School District, 168 F.3d 806, 817 (5th Cir. 1999). This is similar to analysis pursuant to the endorsement test. Under either the second Lemon prong or the endorsement test, the Supreme Court has cautioned that a government practice may not aid one religion, aid all religions, or favor one religion over another. See, e.g., County of Allegheny v. ACLU,

13

492 U.S. 573, 605, 109 S. Ct. 3086, 3107 (1989) ("Whatever else the Establishment Clause may mean (and we have held it to mean no official preference even for religion over nonreligion), it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions)." (citation omitted)). Nonetheless, where the benefit to religion or to a church is no more than indirect, remote, or incidental, the Supreme Court has advised that "no realistic danger [exists] that the community would think that the [contested government practice] was endorsing religion or any particular creed." Lamb's Chapel v. Center Moriches Union Free School District, 508 U.S. 384, 395, 113 S. Ct. 2141, 2148 (1993).

Against this jurisprudential backdrop, the School Board argues that the contested disclaimer's primary effect is "to communicate to students that they are free to form their own opinions or maintain beliefs taught by parents concerning the origin of life and matter." According to the School Board, the disclaimer advances freedom of thought, as well as sensitivity to, and tolerance for, diverse beliefs in a pluralistic society. We disagree.

In assessing the primary effect of the contested disclaimer, we focus on the message conveyed by the disclaimer to the students who are its intended audience. See County of Allegheny, 492 U.S. at 620, 109 S. Ct. at 3115. After careful consideration of the oral arguments, the briefs, the record on appeal, and the

14

language of the disclaimer, we conclude that the primary effect of the disclaimer is to protect and maintain a particular religious viewpoint, namely belief in the Biblical version of creation.  In reaching this conclusion, we rely on the interplay of three factors: (1) the juxtaposition of the disavowal of endorsement of evolution with an urging that students contemplate alternative theories of the origin of life; (2) the reminder that students have the right to maintain beliefs taught by their parents regarding the origin of life; and (3) the "Biblical version of Creation" as the only alternative theory explicitly referenced in the disclaimer.

We note that the term "disclaimer," as used by the School Board to describe the passage to be read to students before lessons on evolution, is not wholly accurate.  Beyond merely "disclaiming" endorsement of evolution, the two paragraph passage urges students to take action--to "exercise critical thinking and gather all information possible and closely examine each alternative" to evolution.[3]  The disclaimer, taken as a whole, encourages students to read and meditate upon religion in general and the "Biblical version of Creation" in particular.[4]

---

[3]In passing on the constitutionality of the contested disclaimer, we consider the disclaimer as a whole.  Accordingly, we do not express an opinion as to whether the first paragraph standing alone impermissibly advances religion.

[4]The School Board asserts that the reference to the "Biblical version of Creation" is merely illustrative, affording meaning to the phrase "other concepts."  The School Board's use of a religious concept as the only illustration of an "other concept[]," however, supports our conclusion that the disclaimer impermissibly advances religion.  Cf. Ingebretsen v. Jackson

15

Although it is not per se unconstitutional to introduce religion or religious concepts during school hours, there is a fundamental difference between introducing religion and religious concepts in "an appropriate study of history, civilization, ethics, comparative religion, or the like" and the reading of the School Board-mandated disclaimer now before us.  Stone v. Graham, 449 U.S. 39, 42, 101 S. Ct. 192, 194 (1980).  The TPPS disclaimer[5] does not encourage students to think about religion in order to provide context for a political controversy studied in a history class, see, e.g., Aquillard, 482 U.S. at 607 n.8, 107 S. Ct. at 2590 n.8 (Powell, J., concurring) ("For example, the political controversies in Northern Ireland, the Middle East, and India cannot be understood properly without reference to the underlying religious beliefs and the conflicts they tend to generate."), or to promote understanding of different religions, see, e.g., School District of Abington v. Schempp, 374 U.S. 203,

_____

Public School District, 88 F.3d 274, 279 (5th Cir. 1996) (explaining that a government measure advances religion when it "gives a preferential, exceptional benefit to religion [or a particular form of religion] that it does not extend to anything else").  We also note that the record does not comport with the School Board's characterization of its reason for including "Biblical version of Creation" in the disclaimer.  When the School Board debated the propriety of the proposed disclaimer, a member suggested deleting the reference to the Biblical version of creation.  The Board ultimately rejected that suggestion, apparently not because doing so might confuse students who needed an illustrative reference, but because doing so would, in the words of the disclaimer's sponsor, "gut . . . the basic message of the [disclaimer]."

[5]Despite our conclusion that the statement to be read student does more than "disclaim" evolution, we will continue to refer to the entire statement as a disclaimer for purposes of convenience.

16

225, 83 S. Ct. 1560, 1573 (1963) ("[I]t might well be said that one's education is not complete without a study of comparative religion or the history of religion and its relationship to the advancement of civilization."). Instead, the disclaimer-- including the directive to "exercise critical thinking" in the second paragraph, together with the explicit reference to the "Biblical version of Creation" in the first paragraph--urges students to think about religious theories of "the origin of life and matter" as an <u>alternative</u> to evolution, the State-mandated curriculum.

The School Board cites two cases, <u>Lamb's Chapel v. Center Moriches Union Free School District</u>, 508 U.S. 384, 113 S. Ct. 2141 (1993), and <u>Widmar v. Vincent</u>, 454 U.S. 263, 102 S. Ct. 269 (1981), in defense of its position that any benefit to religion conferred by the disclaimer is merely incidental and that, as such, the disclaimer does not impermissibly advance religion. These cases, in which the Supreme Court found that government action did not violate the Establishment Clause, are distinguishable.

In <u>Widmar</u>, members of a registered religious group at a state university brought an action challenging a university policy which excluded religious groups from being able to utilize university facilities that were generally available for activities of registered student groups. <u>See</u> <u>Widmar</u>, 454 U.S. at 266, 102 S. Ct. at 273. The Court found that the challenged policy violated the First Amendment. <u>See</u> <u>id.</u> at 277, 102 S. Ct.

17

at 278.  In reaching this conclusion, the _Widmar_ Court explained

that a "religious organization's enjoyment of merely 'incidental'

benefits does not violate the prohibition against the 'primary

advancement' of religion."  See _id._ at 273, 102 S. Ct. at 276.

The Court relied on two factors.  See _id._ at 274, 102 S. Ct. at

276.  First, the Court found that, in allowing a registered

student religious organization to use an otherwise open forum, a

public university "does not confer any imprimatur of state

approval on religious sects or practices."  _Id._, 102 S. Ct. at

276.  Second, the court found that use of the university

facilities is available to a broad class of speakers, including

nonreligious speakers.  See _id._, 102 S. Ct. at 277.

Unlike in _Widmar_, the particular benefit to religion at

issue here is not merely incidental.  A teacher's reading of a

disclaimer that not only disavows endorsement of educational

materials but also juxtaposes that disavowal with an urging to

contemplate alternative religious concepts implies School Board

approval of religious principles.  Moreover, unlike the public

forum at issue in _Widmar_, the disclaimer crafted by the School

Board serves only to promote a religious alternative to

evolution.  We know this because the only alternative theory

explicitly referenced in the text of the disclaimer is a

religious one.  Therefore, _Widmar_ does not support the Board's

argument.

The School Board's reliance on _Lamb's Chapel_ is misplaced as

well.  In that case, the Court held that using a public school

18

after school hours for the showing of religiously oriented films did not violate the Establishment Clause.  See Lamb's Chapel, 508 U.S. at 395, 113 S. Ct. at 2148.  The Court found that "this film series would not have been during school hours, would not have been sponsored by the school, and would have been open to the public, not just to church members."  Id., 113 S. Ct. at 2148.  The Court concluded that, under these circumstances, there was no realistic danger that the community would think that the school district was endorsing religion.

There are few, if any, parallels between the instant case and Lamb's Chapel.  Here, the disclaimer approved by the School Board is to be read during school hours by school teachers and explicitly encourages students to consider religious alternatives to evolution, a part of the state-mandated curriculum.  Unlike in Lamb's Chapel, there is a much greater danger of students and parents perceiving that the School Board endorses religion, specifically those creeds that teach the Biblical version of creation.

The benefit to religion conferred by the reading of the Tangipahoa disclaimer is more than indirect, remote, or incidental.  As such, we conclude that the disclaimer impermissibly advances religion, thereby violating the second prong of the Lemon test as well as the endorsement test.

IV

The School Board additionally disputes the district court's award of attorneys' fees to Appellee Freiler.  We review a

19

district court's award of attorneys' fees for abuse of discretion, and its factual findings relating to the award of attorneys' fees for clear error. See Watkins v. Fordice, 7 F.3d 453, 457 (5th Cir. 1993). Where a decision awarding attorneys' fees is adequately supported by the record and the district court has explained its reasons for the award, there is no abuse of discretion. See Strong v. Bellsouth Telecommunications, Inc., 137 F.3d 844, 851 (5th Cir. 1998).

The district court found that Freiler was a prevailing party and awarded Freiler attorneys' fees pursuant to 42 U.S.C. § 1988. The court used the lodestar method of determining the appropriate award, first multiplying an hourly rate by hours expended, and then adjusting the award according to the factors outlined in Johnson v. Georgia Highway Express, 488 F.2d 714 (1974).

The district court found that Freiler's counsel kept contemporaneous time records, and that they were therefore not reconstructed. The court found that the records contained sufficient detail to determine the time expended in pursuing Freiler's claim. The district court also reduced the number of hours that Freiler's counsel billed by ten percent to reflect "possible redundancy and work which in hindsight may have been unnecessary." Lastly, the district court applied an hourly rate of $150,[6] based explicitly on application of the Johnson factors.

_____

[6] Freiler's counsel had petitioned the court to award fees based on an hourly rate of $175 an hour. The court agreed that the $175 rate was "arguably" reasonable, but decided that a $150 rate was more appropriate based on Johnson.

The court multiplied the $150 rate by the adjusted billable hours, and awarded $49,444.50 to Freiler's counsel.

We affirm the district court's award of attorneys' fees. First, the billing records are sufficiently detailed under our analysis in League of United Latin American Citizens #4554 v. Roscoe Independent School District, 119 F.3d 1228, 1233 (5th Cir. 1997). In that case, we found that billing records were adequate where the records showed the date, the number of hours spent, and a "short but thorough description of the services rendered." Id. Second, even if Freiler's counsel failed to contemporaneously produce billing records, as the School Board argued, such a failure "does not preclude an award of fees per se, as long as the evidence produced is adequate to determine reasonable hours." Louisiana Power & Light Co. v. Kellstrom, 50 F.3d 319, 325 (5th Cir. 1995). Third, the district court did not commit clear error in finding the $150 rate to be reasonable, given the declarations that it reviewed from three New Orleans attorneys regarding prevailing rates. Fourth, the district court did not commit clear error when, instead of addressing the necessity and potential redundancy of each billed hour, it reduced the overall number of hours by ten percent. Indeed, Louisiana Power & Light Co. v. Kellstrom, 50 F.3d 319, 325 (5th Cir. 1995), the only case cited by the School Board in support of its argument that a district court must analyze each billing item, is distinguishable. In Kellstrom, the issue was whether the billing records were sufficiently detailed, not whether the district

court judge had discretion to reduce the amount of hours billed by a percentage.  See id. at 325.

## VI.

For the foregoing reasons, we affirm the district court's ruling that the disclaimer violates the First Amendment and the district court's award of attorneys' fees to Appellee Freiler.

AFFIRMED.