**John BAUSCH, Plaintiff,**

v.

**Debra SUMIEC, Michael Sullivan and Jon Litscher, Defendants.**

No. 99–C–684.

United States District Court,
E.D. Wisconsin.

April 10, 2001.

Walter H. Stern, Stern Law Office, Union Grove, WI, for plaintiff.

James E. Doyle, Jr., John J. Glinski, Wisconsin Department of Justice, Office of the Attorney General, Madison, WI, for defendants.

### DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff John Bausch, a former Wisconsin prisoner and parolee, brings this action under 42 U.S.C. § 1983. He claims that defendants, his former parole officer and the former and present Secretaries of the Wisconsin Department of Corrections, violated the Establishment Clause of the First Amendment, as made applicable to states by the Fourteenth Amendment, by compelling his participation in a religiously-oriented substance abuse treatment program. Before me now is defendants' motion for summary judgment.

1. This defendant has since changed her name to Debra Stuczynski–Sumiec.

2. In its website, Exodus House describes itself as located "one block from the business district and within walking distance of almost all church denominations, various clubs and library." The Exodus House: Transitional Care Facility, *at* *http://www.hnet. net/good/charity/exodus.htm* (last visited April 4, 2001). In addition, the program's statement of non-discrimination in admissions omits religion. *Id.*

## I. FACTUAL BACKGROUND

In 1993, plaintiff was convicted of delivery of a controlled substance as a repeater and sentenced to prison. In December 1995, he was paroled. While on parole, he abused drugs and alcohol, committing a total of eight violations of his conditions of parole. In April 1997, defendant Debra Sumiec,[1] plaintiff's parole officer, advised him that as an alternative to parole revocation he could enter the Exodus House residential substance abuse treatment program. The Exodus House program is based on the principles of Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) and has a substantial religious component.[2] Sumiec apparently did not advise plaintiff that as an alternative to revocation he could participate in a secular treatment program. Plaintiff agreed to participate in the Exodus House program.

Plaintiff states in an affidavit that he is an atheist and that he had objections to the religious nature of the Exodus House program, but that he participated in it because he believed that it was the only way he could avoid having his parole revoked. He further states that while he was in the program he informed his counselor, Rick Stordick, of his objections to the program. Defendants, however, present evidence that plaintiff did not advise parole officials, including Stordick, of his objections to the Exodus House program.[3]

3. In his unsworn complaint, plaintiff also alleges that his then attorney, William Mayer, advised defendant Sumiec of his objections to Exodus House, however, Mayer's affidavit does not support this allegation. On a summary judgment motion I may consider only material that would be admissible at trial, *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir.2000). Because this allegation is not sworn, it is not admissible evidence, thus I disregard it.

In addition to his claim against Sumiec, plaintiff alleges that defendant Michael Sullivan, who was Secretary of the Wisconsin Department of Corrections from 1993 until January 1999, and defendant Jon Litscher, who succeeded Sullivan, are liable because they failed to implement a court decision prohibiting the constitutional violation that he alleges occurred here.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no *genuine* issue as to any *material* fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis deleted). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." *Id.*

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), courts should act with caution in granting summary judgment, *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. *Id.* at 248, 106 S.Ct. 2505.

The moving party bears the initial burden of demonstrating that he is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. Where the moving party seeks summary judgment on the ground that there is an absence of evidence to support the nonmoving party's case, the moving party may satisfy its initial burden simply by pointing out the absence of evidence. *Id.* at 325, 106 S.Ct. 2548. Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. *Id.* at 322–23, 106 S.Ct. 2548. Neither party may rest on mere allegations or denials in the pleadings, *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505, or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir.1989). In considering a motion for summary judgment, I may consider any materials that would be admissible or usable at trial, including properly authenticated and admissible documents. *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir.2000).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991).

## III. ANALYSIS

### A. Establishment Clause

■ Title 42 U.S.C. § 1983 states that: [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of

any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.

In order to prove a violation of § 1983, plaintiff must show that defendants deprived him of a federal constitutional right while acting under color of state law. *Abraham v. Piechowski,* 13 F.Supp.2d 870, 879 (E.D.Wis.1998).

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. As summarized by the Fifth Circuit, the Supreme Court has established three complementary (and occasionally overlapping) tests:

> The first test, and the one of longest lineage, is the disjunctive three-part *Lemon* test, under which a state practice is unconstitutional if (1) it lacks a secular purpose; (2) its primary effect either advances or inhibits religion; or (3) it excessively entangles government with religion. *See Lemon [v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) ].* The second test, commonly referred to as the endorsement test, seeks to determine whether the government endorses religion by means of the challenged action. *See, e.g., County of Allegheny v. ACLU,* 492 U.S. 573, 594, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) .... Finally, the third test, aptly named the coercion test, analyzes school-sponsored religious activity in terms of the coercive effect that the activity has on students. *See, e.g., Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992).

*Freiler v. Tangipahoa Parish Bd. of Educ.,* 185 F.3d 337, 343 (5th Cir.1999) (parallel citations and explanatory parentheticals omitted), *cert. denied,* 530 U.S. 1251, 120 S.Ct. 2706, 147 L.Ed.2d 974 (2000).

The Seventh Circuit adopted *Lee* 's coercion test to assess whether a prison could constitutionally require a prisoner to attend NA meetings, on pain of being transferred to a higher-security prison and denied the hope of parole. *Kerr v. Farrey,* 95 F.3d 472, 474 (7th Cir.1996). The court identified three crucial points to the coercion test: (1) whether there was state action; (2) whether the action amounted to coercion; and (3) whether the object of the coercion was religious or secular. *Id.* at 479. The Seventh Circuit quickly found that the NA requirement was state action and that the prisoner was coerced; after more extensive discussion, it concluded that the NA program could not be considered secular and that the NA requirement was therefore unconstitutional. *Id.* at 479–80. *Kerr* permits the state to condition parole on participation in a religiously-oriented treatment alternative to revocation only if the religiously-oriented alternative is not "the only choice available." *Id.* at 480.[4]

The present defendants concede that this case is governed by the coercion test. They further acknowledge that they were state officials acting under color of law, and that the Exodus House program is religious in nature. They contend, however, that they did not coerce plaintiff into participating in the program. As stated above, the only alternative to parole revocation of which they informed plaintiff was the religiously-oriented Exodus House

---

**4.** The secular alternatives must, of course, be meaningful, rather than available in name only. For a thoughtful discussion of this issue, see Michael G. Honeymar, Jr., Note, *Al-*

*coholics Anonymous as a Condition of Drunk Driving Probation: When Does it Amount to Establishment of Religion?,* 97 Colum. L.Rev. 437, 464–71 (1997).

program. However, defendants assert that plaintiff could have objected to that program, in which case he would have been offered a secular alternative, but that he failed to do so.

The issue in this case is whether the circumstances that plaintiff faced were coercive. In *Lee*, Justice Kennedy, writing for a five-justice majority, found that even "subtle psychological pressure," at least in the context of elementary and secondary public schools, could be coercive. *Lee*, 505 U.S. at 592, 112 S.Ct. 2649.[5] The four-justice dissent, authored by Justice Scalia, criticized the majority's adoption of a "psychological coercion" test, and proposed instead that the appropriate standard was "legal coercion." *Id.* at 636, 641, 112 S.Ct. 2649 (Scalia, J., dissenting). The dissent defined legal coercion as "coercion of religious orthodoxy and of financial support by force of law and threat of penalty." *Id.* at 640, 112 S.Ct. 2649 (emphasis omitted).

All nine justices thus agreed that unconstitutional religious coercion arises when the state exerts the force of law and the threat of penalty to induce an individual to participate in religious activity. It is thus no surprise that in *Kerr* the Seventh Circuit held that the coercion element was "satisfied easily" because the plaintiff there "was subject to significant penalties if he refused to attend the NA meetings: classification to a higher security risk category and adverse notations in his prison record that could affect his chances for parole." *Kerr*, 95 F.3d at 479.

■■■ As a parolee, the present plaintiff remained in the legal custody of the Department of Corrections. Wis. Stat. Ann. § 304.06(3) (West 2000 Supp.). Moreover, he had been determined to have violated no fewer than eight conditions of his parole, and could thus have been returned to prison for any length of time up to the remainder of his sentence. *Id.* As the Supreme Court has observed, "the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others." *Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Wisconsin allows the Department of Corrections and the Division of Hearings and Appeals to revoke parole only after "at least considering whether alternatives are available and feasible." *Van Ermen v. State Dep't of Health & Soc. Servs.*, 84 Wis.2d 57, 67, 267 N.W.2d 17 (1978); Wis. Admin. Code § HA 2.05(7)(b)(3) (Nov.1999). Because Exodus House was presented to plaintiff as the only available and feasible alternative to revocation, he faced the "force of law" and the "threat of penalty" even more dramatically than the plaintiff in *Kerr*; participating in the Exodus House program was effectively presented to him as a condition of remaining on parole, and so far as he knew, the penalty for declining was being returned to prison. *See also Warner v. Orange County Dep't of Prob.*, 115 F.3d 1068, 1075 (2d Cir.1996) (finding it coercive to sentence probationer to AA therapy "without suggesting that the probationer might have any option to select another therapy program, free of religious content"), *vacated by id.* at 1081 *and reinstated by* 173 F.3d 120, 122 (2d Cir.1999), *cert. denied*, 528 U.S. 1003, 120 S.Ct. 495, 145 L.Ed.2d 382 (1999); *Rauser v. Horn*, No. Civ. 98–1538, 1999 WL 33257806, at *7, 1999 U.S. Dist. Lexis 22583, at *19

---

**5.** All four justices who joined Justice Blackmun's majority opinion wrote or joined concurrences emphasizing that coercion is not required to violate the Establishment Clause. *Lee*, 505 U.S. at 604, 112 S.Ct. 2649 (Blackmun, J., concurring, joined by Stevens and O'Connor, JJ.); *id.* at 621, 112 S.Ct. 2649 (Souter, J., concurring, joined by Stevens and O'Connor, JJ.).

(W.D.Pa. Nov.2, 1999) (recommending that Establishment Clause violation be found where parole conditioned on participation in religious-based rehabilitation program, and recommending that defendant be ordered to offer alternative programs without religious component), *adopted,* 1999 U.S. Dist. LEXIS 22580 (W.D.Pa. Dec. 3, 1999), *rev'd on other grounds,* 241 F.3d 330 (3d Cir.2001); *Griffin v. Coughlin,* 88 N.Y.2d 674, 649 N.Y.S.2d 903, 673 N.E.2d 98, 111 (1996) (finding coercion present when inmate's eligibility for "discretionary" family visits was made conditional upon his "voluntary choice" not to attend AA-based program due to religious objections); *Arnold v. Tenn. Bd. of Paroles,* 956 S.W.2d 478, 484 (Tenn.1997) (holding it unconstitutional to require parolee to participate in religious-based rehabilitation programs without offering secular alternatives).

To support their contention that a choice is not coercive if there are options unknown to the person who must choose, defendants rely upon *O'Connor v. California,* 855 F.Supp. 303 (C.D.Cal.1994). Drunk drivers were required to participate in a "self-help" program. *Id.* at 305. The plaintiff testified that AA was the only program that he was told he could participate in to satisfy the requirement, and he was told about a secular alternative only after he complained about the religious nature of the AA program. *Id.* The court applied *Lemon*'s entanglement test and *County of Allegheny*'s endorsement of religion test, and found that there was nei-

ther excessive government entanglement in or endorsement of religion. The court found it significant that "the individual has a *choice* over what program to attend," and emphasized that offenders were allowed to devise their own means of self-help and seek approval from the county, and thus had an "array of options." *O'Connor,* 855 F.Supp. at 308 (emphasis in original). Neither the present defendants, nor the court in *O'Connor,* explain how an individual can be considered to have a choice when the available options are unknown to him. I do not believe that a person in such a situation realistically has a choice, and thus I find *O'Connor* unpersuasive.[6]

■ Defendants' assertion that plaintiff needed only to request a secular alternative rings hollow. First, it is government's obligation always to comply with the Constitution, rather than to do so only upon request. Defendants' assertion that they stood ready to provide a secular alternative, if asked, would reduce the evil of government inducements to participate in religiously-based programs only for "those brave or resourceful enough to assert their rights but [not for] the untold number who feel they have little choice but to comply." Derek P. Apanovitch, Note, *Religion and Rehabilitation: The Requisition of God by the State,* 47 Duke L.J. 785, 850 (1998).

Second, defendants' argument is based upon an unrealistic assumption about the relative bargaining strengths of the parties. Skilled negotiators bargaining as

---

**6.** Further, the *O'Connor* court was applying the *Lemon* test, rather than *Lee,* and thus had no need to assess whether the plaintiff there was coerced. Several commentators have observed that, in practice, whether a court applies *Lemon* or the coercion test appears outcome-determinative. Rachel F. Calabro, Comment, *Correction Through Coercion: Do State Mandated Alcohol and Drug Treatment Programs in Prisons Violate the Establishment*

*Clause?,* 47 DePaul L.Rev. 565, 582 (1998); Dess Aldredge Grangetto, Comment, *Reducing the Citizen by Substance Abusers Who Commit Drug and Alcohol Related Crimes,* 10 J. Contemp. Legal Issues 383, 404–06 (1999); Byron K. Henry, Note, *In "A Higher Power" We Trust: Alcoholics Anonymous As a Condition of Probation and Establishment of Religion,* 3 Tex. Wesleyan L.Rev. 443, 454–65 (1997).

equals commonly do seek to add options to those initially proposed. But the present plaintiff was a parolee who had violated the conditions of his parole and was thus subject to being returned to prison. He was in no position to request concessions or to propose alternatives. Indeed, the only factor in his favor was the state's requirement that alternatives to revocation be considered—but so far as he knew, the Exodus House offer satisfied that requirement. In short, plaintiff had nothing on his side, and his parole officer and the administrative law judge had a very credible threat of prison on their side. The atmosphere that plaintiff faced when told to make his choice was thus inherently coercive, much as the atmosphere facing suspects in custodial police interrogation is. *Miranda v. Ariz.,* 384 U.S. 436, 458, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). And just as the inherently coercive atmosphere of custodial interrogation may be dispelled only by informing the suspect of his right to counsel, *id.,* so the only way to dispel the inherently coercive atmosphere present here was to advise plaintiff of his right to a meaningful secular alternative.

Third, the need for full disclosure of an offender's constitutional alternatives is even stronger here than in the *Miranda* context. Police officers, and society generally, do have a legitimate interest in obtaining truthful confessions. This led four justices in *Miranda* to dissent on the ground that a test giving weight to society's interests was more appropriate. *Id.,* 384 U.S. at 503, 86 S.Ct. 1602 (Clark, J., dissenting); *id.* at 509, 86 S.Ct. 1602 (Harlan, J., dissenting, joined by Stewart and White, JJ.). But there is no legitimate societal interest in concealing the availability of non-religious alternatives from parolees facing revocation. Indeed, there is considerable reason to require such alternatives to be disclosed, over and beyond avoiding unconstitutional religious coercion. Parole is intended to help individuals reintegrate into society as constructive individuals as soon as they are able. *Morrissey,* 408 U.S. at 477, 92 S.Ct. 2593. Once it is determined that a parolee has committed a parole violation, the question is whether parole should be revoked, or whether other steps should be taken to protect society and improve chances of rehabilitation. *Id.* at 480, 92 S.Ct. 2593. Society has a strong interest in treating the parolee fairly; "fair treatment in parole revocations will enhance the chance of rehabilitation by avoiding reactions to arbitrariness." *Id.* at 484, 92 S.Ct. 2593. Just as it is hard to conceive any state interest in revoking parole without any procedural guarantees, *id.,* so it is hard to conceive (and defendants have not suggested) any state interest that is served by failing to advise a parolee facing revocation that meaningful non-religious alternatives are available.

This reading of *Kerr* is bolstered by the fact that the Wisconsin Department of Corrections has interpreted the case as I do. In August 1998, two years after *Kerr* was decided, the Department's Office of Legal Counsel summarized the decision as follows:

> Agents cannot order offenders to attend alcohol or drug treatment at a 12 step program *without offering a secular alternative. Kerr v. Farrey,* 95 F.3d 472 (1996). The United States 7th Circuit Court of Appeals has ruled that to force an offender to attend a treatment program with religious components violates the establishment clause of the 1st Amendment to the United States Constitution. As a result, agents should write rules that order the offender to attend and complete out-patient (in-patient) alcohol/drug treatment without citing a specific program. The offender can attend a 12 step program if they choose, *but a non-religious alternative must be offered.*

Robert G. Pultz, Ass't Legal Counsel, Wis. Dep't of Corrections, *Legal Briefs, in* Dep't of Corr. Div. of Cmty. Corr. Newsl., Aug. 1998, at 11 (emphasis added), *available in* R. 36 Ex. 112. Fourteen months later, the Department issued its parole and probation agents a formal directive pursuant to *Kerr* as follows:

The United States 7th Circuit Court of Appeals, in *Kerr v. Farrey*, 95 F.3d 472 (1996), ruled that to order an offender to attend a treatment program with religious components violates the establishment clause of the 1st Amendment to the United States Constitution. Agents cannot, as a condition of probation or parole, direct offenders to attend treatment or support programs that have a religious component. An agent cannot consider an offender in violation of supervision if the offender fails to attend a treatment or support program with a religious component. The court considered Alcoholics Anonymous, for instance, to be a program with a religious component since the program refers to a "higher power" and to "God as we understood him".

Agents can order offenders to attend specific treatment or support programs as long as they are secular in nature. An offender may choose to attend a treatment program with religious components, *but a non-religious alternative must be offered and agents must document this*. For example: An offender is required to attend a support program. The agent directs the offender to attend a non-religious program but the offender *requests* to attend AA and the agent agrees. The agent must document that it was the offender's choice to attend AA in order to consider the offender in vio-

lation of supervision should the offender fail to attend AA meetings.

Div. of Cmty. Corr., Wis. Dep't of Corr., *Administrative Directive .99–15; Kerr v. Farrey* 1 (Oct. 19, 1999) (first emphasis added), *available in* R. 36 Ex. 113.[7] These statements make clear that the Department also interprets *Kerr* as establishing that an offender cannot be said to have freely chosen a religiously-oriented treatment program as an alternative to revocation unless a meaningful secular alternative is also offered. In the present case it does not appear that defendant Sumiec or any other Department employee advised plaintiff that as an alternative to parole revocation he had the option of attending a secular treatment program.

Finally, even if my analysis of *Kerr* (and the Department's) is mistaken, and it was sufficient for defendants to offer plaintiff only a religious-oriented treatment program as an alternative to revocation as long as he did not object, there is nevertheless a factual issue as to whether plaintiff did, in fact, object. Plaintiff states that he told his counselor, Rick Stordick, that he objected to the program's religious content. Stordick disputes this, thereby creating a genuine issue of fact. Thus, defendants' motion for summary judgment with respect to the issue of whether plaintiff's rights under the Establishment Clause were violated will be denied.

**B. Personal Involvement of Defendants Sullivan and Litscher**

Defendants Sullivan and Litscher argue that plaintiff's claims against them must be dismissed because they were not personally involved in his case. Plaintiff, however, contends that they did not implement the *Kerr* decision in a timely manner, and that

---

**7.** As plaintiff observes, this directive was issued only months after the present lawsuit was filed.

this failure caused Sumiec to violate his rights under the Establishment Clause.

■■■ Section 1983 creates a cause of action based upon personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation. *Wolf–Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983). However, direct participation by a defendant is not necessary. Any official who "causes" a citizen to be deprived of his constitutional rights can be held liable. The requisite causal connection is satisfied if a defendant set in motion a series of events that the defendant knew or should reasonably have known would cause others to deprive the plaintiff of his constitutional rights. *Conner v. Reinhard,* 847 F.2d 384, 397 (7th Cir.1988). Moreover, a defendant deprives another of a constitutional right if he performs or omits to perform an act that is legally required and that causes the deprivation. *Wickstrom v. Ebert,* 585 F.Supp. 924, 935 (E.D.Wis.1984).

■■■ *Kerr* was decided in August 1996 when defendant Sullivan was the Department Secretary. The Secretary has supervisory authority over the manner in which parole officers operate. The Department did not issue a directive to parole and probation officers ordering them to comply with the requirements of the *Kerr* decision for well over three years. Plaintiff argues that if Sullivan had promptly implemented *Kerr,* defendant Sumiec would not have behaved as she did in April 1997, thus it is reasonable to hold Sullivan responsible for the deprivation of plaintiff's rights. Defendants do not dispute that probation and parole agents did not receive a directive implementing *Kerr* until October 1999, three years and two months after *Kerr* was issued. Prior thereto, defendants state that the Department only advised certain executives of the decision and dis-tributed a newsletter in August 1998, quoted above, summarizing the decision.

Plaintiff has presented sufficient evidence from which a reasonable jury could conclude that defendant Sullivan was derelict in not promptly advising all parole and probation agents of their duties under *Kerr,* and that his dereliction caused defendant Sumiec to handle plaintiff's parole violation in a manner inconsistent with *Kerr.* Therefore, defendants' motion for summary judgment based on the lack of personal Secretarial involvement in plaintiff's case will be denied with respect to Sullivan.

Defendant Litscher, however, did not become Secretary until January 1999, well after the occurrences giving rise to this case. Moreover, prior to becoming Secretary, Litscher was not a corrections official but worked for another state agency. Thus, no reasonable jury could conclude that Litscher caused a deprivation of plaintiff's rights. Therefore, with respect to Litscher, defendants' motion for summary judgment will be granted.

**C. Qualified Immunity**

■■■ Defendants argue that they are entitled to qualified immunity from civil damages under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Under the doctrine of qualified immunity, "governmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. 2727. Courts thus employ an objective test for determining whether public official defendants are entitled to qualified immunity. *See id.; Triad Assocs., Inc. v. Robinson,* 10 F.3d 492, 496 (7th Cir.1993). Once a defendant has

pleaded a defense of qualified immunity courts employ a two step· analysis: (1) does the alleged conduct set out a constitutional violation, and (2) were the constitutional standards clearly established at the time? *See Siegert v. Gilley*, 500 U.S. 226, 231–32, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).

The plaintiff bears the burden of establishing the existence of a clearly established constitutional right. *Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th Cir. 1988). The burden is a heavy one and appropriately so because qualified immunity is designed to shield from civil liability " 'all but the plainly incompetent or those who knowingly violate the law.' " *Hughes v. Meyer*, 880 F.2d 967, 971 (7th Cir.1989) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). In *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Supreme Court explained that "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right" at the time of the incident. In determining whether the contours of a right are sufficiently clear I look first to case law on point or in closely analogous areas to see whether "reasonably diligent government officials would have known of the case law, related it to the situation at hand, and molded their conduct accordingly." *Lojuk v. Johnson*, 770 F.2d 619, 628 (7th Cir.1985). Nonetheless, the government official is entitled to qualified immunity only if there is uncertainty about what legal standard is applied to analyze the constitutional claim at issue; there may still be uncertainty in the application of that standard to particular situations; but this is not the kind of legal uncertainty that gives rise to qualified immunity. *McNair v. Coffey*, 234 F.3d 352, 354 (7th Cir.2000), *petition for cert. filed*, 69 U.S.L.W. 3631 (U.S. Mar. 8, 2001) (No. 00–1456).

Concretely, the question presented is whether a reasonable corrections official would have known in April 1997 and thereafter that it violated the Establishment Clause to present to a parolee, as his only alternative to revocation, a choice to participate in a religiously-oriented substance abuse treatment program. *Kerr* was decided in August 1996. Earlier in this discussion I rejected defendants' contention that the facts of the present case are so different from those of *Kerr* as to warrant granting summary judgment to defendants. I reiterate here my conclusion that the contours of the right that plaintiff asserts were defined sufficiently clearly in *Kerr* so that a reasonable official would understand that what was done in the present case violated the Establishment Clause as explicated in *Kerr*. *Kerr* proscribes offering an offender a religiously-oriented treatment program as the only alternative to parole revocation, precisely what defendants are alleged to have done here.

Further, however, even if I am mistaken as to the contours of the right established in *Kerr*, qualified immunity would still be unavailable to the defendants if the factual issue as to whether plaintiff objected to the religiously-oriented treatment was resolved in plaintiff's favor. Thus, at a minimum, the issue of qualified immunity cannot be resolved until the determination of this disputed factual issue.

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment is **DENIED** as to Sumiec and Sullivan and **GRANTED** as to Litscher.