# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 2, 2010

No. 09-50401

Lyle W. Cayce
Clerk

CHRISTINA CASTILLO COMER,

Plaintiff-Appellant,

v.

ROBERT SCOTT, Commissioner, Texas Education Agency, in his official capacity; TEXAS EDUCATION AGENCY,

Defendants-Appellees.

Appeal from the United States District Court
for the Western District of Texas

Before BENAVIDES, STEWART, and SOUTHWICK, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge:

In the present case, this Court is presented with the question of whether the Texas Education Agency's ("TEA") neutrality policy constitutes an establishment of religion, in violation of the First Amendment's Establishment Clause. Because we find no evidence to support the conclusion that the principal or primary effect of TEA's policy is one that either advances or inhibits religion, we conclude that the policy does not violate the Establishment Clause. As such, we affirm the decision of the district court.

No. 09-50401

## FACTS AND PROCEDURAL BACKGROUND

This case arises out of TEA's decision to terminate Plaintiff Christina Castillo Comer ("Comer") after she violated TEA's neutrality policy—a policy requiring staff to remain neutral and refrain from expressing any opinions on any curricular matter subject to the Texas State Board of Education's ("Board") jurisdiction.

The Board and TEA are independent state actors, with distinct but overlapping responsibilities for administering public education in Texas. The Board is statutorily tasked with "establish[ing] curriculum and graduation requirements" and determining which textbooks shall be purchased by the state for school use. Tex. Educ. Code §§ 7.102(c)(4), 31.022, 31.023. TEA is led by the Commissioner of Education (in this case, Defendant Robert Scott), who is appointed by the Governor subject to Senate confirmation. *Id*. §§ 7.051, .055.

Because the Board has no staff of its own, the Commissioner provides TEA staff that assist the Board with the administrative, procedural, and clerical tasks necessary to develop the curriculum and specific requirements for graduation. *Id*. §§ 7.055(b)(2)-(3), (5). TEA's role during the curriculum development process is to facilitate the curriculum review meetings, provide resources for the Board's advisors, and to accurately draft and neutrally compile all of the recommendations to the Board and the Board's resulting decisions.

As a result of the function TEA serves in relation to the Board, TEA staff are "directed not to advocate a particular position on [curriculum] issues under deliberation, or participate in any way that could compromise the

2

No. 09-50401

agency's ability to fairly and accurately implement the policy choices made by the Board." Thus the record reflects, and Comer does not dispute, that TEA maintains a "neutrality policy." In accordance with this neutrality policy, TEA staff can describe the contents of Board policy to others in neutral terms, if their jobs call for it, but they may not express opinions on the wisdom of any particular policy option in their capacity as TEA employees. The record also reflects that the neutrality policy has been enforced across a variety of different curriculum issues subject to decision by the Board.

Comer was employed as TEA's Director of Science for the Curriculum Division from May 1998 to November 7, 2007. As a part of her duties as Director of Science, Comer directed the kindergarten through twelfth grade science program in Texas public schools. More specifically, Comer was charged with providing "non-regulatory guidance" concerning the state curriculum and "support and guidance" regarding the Board's Texas Essential Knowledge and Skills ("TEKS") compliance. On October 26, 2007, Comer received an email from Glenn Branch ("Branch email"), addressed to her TEA account, advising her about an upcoming event in Austin entitled "Inside Creationism's Trojan Horse." The email explained that the featured speaker would give a presentation critical of teaching creationism in public schools. Comer responded to the email by promising to "help get the word out," and on that same day, Comer forwarded the Branch email from her TEA email account to thirty-six science teachers in the Austin area and leaders of science teacher organizations.

Comer's direct supervisor, Monica Martinez, determined that forwarding the Branch email violated TEA's neutrality policy, in addition to a

3

## No. 09-50401

directive Martinez had previously issued to Comer based on her past misconduct. Martinez's previous directive to Comer had prohibited Comer from communicating with anyone outside TEA in any way that could imply endorsement of a position on any curriculum issue that may be considered by the Board.[1] Thus, on November 7, 2007, in response to Comer's act of forwarding the Branch email, Martinez drafted a memorandum recommending Comer's termination. After receiving this memorandum, Comer was told to "resign or be fired." The next day she resigned.

On June 30, 2008, Comer filed a complaint for declaratory and injunctive relief in the United States District Court, Western District of Texas, asserting two claims under the First Amendment's Establishment Clause as well as one claim under the Fourteenth Amendment's Due Process Clause. In her complaint, Comer averred that TEA's termination of her employment violated her Due Process rights. Additionally, she asserted that TEA's neutrality policy violates the Establishment Clause because it has the "effect of endorsing religion." According to Comer, terminating her employment deprived her of her right to carry out her duties free of a state policy that has the effect of promoting religion.

---

[1] In November of 2006, Martinez asked Comer not to communicate with anyone outside TEA regarding the Board's science curriculum deliberations in order to ensure that TEA was not releasing premature or inaccurate information. Just a few hours later, Comer forwarded an email to a group of science educators disclosing the very information Martinez asked her not to disclose. As a result of this act, and other acts considered to be "misconduct," Martinez issued a "Letter of Counseling" to Comer in February 2007. The letter provided Comer with a list of directives to follow, including a requirement that she must not "communicate in writing or otherwise with anyone outside the agency in any way that might compromise the transparency and/or integrity of the upcoming TEKS development and revision process."

No. 09-50401

Both sides filed motions for summary judgment. The district court heard oral argument on the motions on December 17, 2008, and on March 31, 2009, the court issued its order and judgment dismissing all of Comer's claims. Specifically as to Comer's Establishment Clause claims, the district court found that "Comer provide[d] no summary-judgment proof raising an issue of material fact regarding whether [TEA's] neutrality policy has a primary effect of advancing or endorsing religion."

Comer timely filed her notice of appeal.[2]

## STANDARD OF REVIEW

"We review a grant of summary judgment *de novo*, applying the same legal standard as the district court." *Croft v. Governor of Tex.*, 562 F.3d 735, 742 (5th Cir. 2009) (internal quotations omitted). Summary judgment should be rendered if the record demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue is material if its resolution could affect the outcome of the action." *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001). "In deciding whether a fact issue has been created, the court must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Id.*

---

[2] On appeal, Comer focuses her argument exclusively on the district court's decision that TEA's neutrality policy does not violate the Establishment Clause. She does not argue that the district court erred in dismissing her Due Process claim. Consequently, we address only the arguments she has raised on appeal, and we do not reach any conclusions regarding the district court's decision to dismiss her Due Process claim. *See Sherman v. United States*, 356 U.S. 369, 376 (1958) ("We do not ordinarily decide issues not presented by the parties . . . .").

5

No. 09-50401

## ANALYSIS

The First Amendment's Establishment Clause provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  "As is plain from its text, the First Amendment was adopted to curtail the power of Congress to interfere with the individual's freedom to believe, to worship, and to express himself in accordance with the dictates of his own conscience."  *Wallace v. Jaffree*, 472 U.S. 38, 49 (1985).[3] Accordingly, the First Amendment's Establishment Clause dictates that:

> Government in our democracy, state and national, must be neutral in matters of religious theory, doctrine, and practice.  It may not be hostile to any religion or to the advocacy of noreligion; and it may not aid, foster, or promote one religion or religious theory against another or even against the militant opposite.  The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.

*Epperson v. State of Ark.*, 393 U.S. 97, 103-04 (1968).

With this constitutional orientation in mind, we also note the particular context in which Comer's appeal arises.  "The Court's inquiry is shaped by the educational context in which it arises: 'First Amendment rights must be analyzed in light of the special characteristics of the school environment.'" *Christian Legal Soc. Chapter of the Univ. of Ca., Hastings Coll. of the Law v. Martinez*, –S.Ct.–, 2010 WL 2555187, *3 (Jun. 28, 2010) (quoting *Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981)).  The Supreme Court has recognized that although state schools must abide by the constitutional restraints imposed by the First Amendment, "[s]tates and local school boards are

---

[3] "This prohibition is applicable to the States through the Fourteenth Amendment." *Abington School Dist. v. Schempp*, 374 U.S. 203, 215-16 (1963).

No. 09-50401

generally afforded considerable discretion in operating public schools." *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987). Further, this Court has previously held that "[s]tates and their duly authorized boards of education have the right to prescribe the academic curricula of their public school systems." *Freiler v. Tangipahoa Parish Bd. of Educ.*, 185 F.3d 337, 342 (5th Cir. 1999). Accordingly, the Supreme Court has "cautioned courts to resist 'substitut[ing] their own notions of sound educational policy for those of school authorities,' for judges lack the on-the-ground expertise and experience of school administrators.'" *Martinez*, 2010 WL 2555187 at *3 (quoting *Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist., Westchester City. v. Rowley*, 458 U.S. 176, 206 (1982)).

The Supreme Court established a general framework for analyzing Establishment Clause challenges in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). To survive an Establishment Clause challenge, the statute or policy must survive all three of *Lemon*'s prongs: (1) "the statute must have a secular legislative purpose;" (2) "its principal or primary effect must be one that neither advances nor inhibits religion;" and (3) "the statute must not foster an excessive government entanglement with religion." *Id.* at 612-13.

Before the district court and now on appeal, Comer has focused her argument exclusively on *Lemon*'s second prong.[4] That is, Comer contends that TEA's neutrality policy's principal and/or primary effect is to advance and/or endorse religion. Comer bases her argument largely on the Supreme Court's decision in *Edwards v. Aguillard*, where the Court held that a

---

[4] Notably, Comer's counsel writes in her brief to this Court: "Comer relied on the Agency's violation of the second prong in the court below, and does so on appeal."

No. 09-50401

Louisiana law proscribing the teaching of evolution as part of the public school curriculum, unless accompanied by a lesson on creationism, violated the Establishment Clause. *See* 482 U.S. at 596-97. By relying on the Supreme Court's decision in *Edwards*, Comer attempts to equate TEA's neutrality policy with the Louisiana law at issue in *Edwards*, arguing that both are unconstitutionally "neutral" and "balanced" in their treatment of evolution and creationism in the classrooms of public schools. According to Comer, the Supreme Court has held that neutrally requiring creationism to be taught with evolution in public schools is unconstitutional, and therefore, TEA's neutrality policy prohibiting her from speaking out against creationism must be in contravention of the Supreme Court's decision in *Edwards*. Thus, argues Comer, the neutrality policy considers creationism to be a legitimate subject matter for the Board to consider in the curriculum, and consequently, the policy constitutes an establishment of religion in violation of her rights under the First Amendment.[5]

_____

[5] We note that Comer has not contested the conclusion that her forwarding of the Branch email actually constitutes a violation of TEA's neutrality policy. Instead, she wholeheartedly accepts, and even asserts, that her conduct constitutes a violation of TEA's policy. Accordingly, we accept it as such. Comer, however, asserts that TEA's application of the policy to her forwarding of the Branch email is evidence that TEA's "neutrality policy" considers creationism to be "substantive curriculum" and consequently, Comer argues, the policy violates the Establishment Clause. We do not agree. Whether TEA considers creationism to be real science or a religion is of no moment and entirely irrelevant to the necessary constitutional analysis at hand. No matter whether TEA considers creationism to be religion or science, nothing in the Establishment Clause forbids a State from *considering* it as substantive curriculum. *See Freiler*, 185 F.3d at 342 ("States and their duly authorized boards of education have the right to prescribe the academic curricula of their public school systems."). Quite to the contrary, the Establishment Clause is invoked when a State takes an action, either through a policy or a statute, that "require[s] that teaching and learning be tailored to the principles or prohibitions of any religious sect or dogma." *Id.* at 343. Mere consideration of such a requirement does not trigger the Establishment Clause.

Comer's aforementioned interpretation and application of *Edwards'* precedent fails for two reasons. First, Comer exclusively argues that TEA's neutrality policy violates *Lemon*'s second prong. The Supreme Court in *Edwards*, however, only found Louisiana's law to be in violation of *Lemon*'s first prong, and consequently, *Edwards*'s analysis is inapposite to this case. Second, when we do consider the argument Comer has raised on appeal—specifically, that TEA's neutrality policy violates *Lemon*'s second prong—we find no evidence in the record to indicate that the neutrality policy's "principal or primary effect" is to advance religion.

In *Edwards*, the Supreme Court considered only whether Louisiana's law violated the first prong of the *Lemon* test, noting that "[t]he purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or disapprove of religion." *Edwards*, 482 U.S. at 585 (quotation marks and citation omitted). Thus, the Supreme Court reasoned that "[a] governmental intention to promote religion is clear when the State enacts a law to serve a religious purpose." *Id.* In considering the challenged law, the *Edwards* Court noted that the State "identified no clear secular purpose for the Louisiana Act." *Id.* Consequently, the Supreme Court's extensive review of the legislative history led the Court to conclude that the Louisiana law served the religious "purpose of discrediting evolution by counterbalancing its teaching at every turn with the teaching of creationism." *Id.* at 589 (quotation marks and citation omitted). Because the *Edwards* Court concluded that the purpose of the law was to promote religion, the Court did not consider the second and third prongs of *Lemon*. *See id.* at 585 ("If the law was enacted for the purpose of endorsing religion, no consideration of the

No. 09-50401

second or third criteria of *Lemon* is necessary.") (internal brackets, quotation marks, and citation omitted).

Yet Comer does not argue that the *purpose* behind TEA's creation of the neutrality policy was to promote religion.[6] And despite Comer's assertions otherwise, we do not read *Edwards* as declaring that the State's balanced and neutral treatment of religion will always violate the First Amendment. *Cf. Epperson*, 393 U.S. at 104 ("The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion."). Instead, we read *Edwards* as declaring that any law labeled as "neutral" or "balanced" violates the Establishment Clause *if* it was "enact[ed] . . . to serve a religious purpose." *Edwards*, 482 U.S. at 585.

Comer, however, argues only that the TEA policy has the "principal or primary effect" of advancing religion. The *purpose* behind a law or statute's enactment is not synonymous with its *effect*. Consequently, Comer's attempt to equate *purpose* with *effect* fails, and we decline to conflate *Lemon*'s first prong with the second.

Furthermore, we do not find ourselves persuaded by Comer's arguments that TEA's policy fails under *Lemon*'s second prong. "*Lemon*'s second prong asks whether, irrespective of [the policy's] actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Freiler*, 185 F.3d at 346. That is, "a government practice may not aid one religion, aid all religions, or favor one religion over another." *Id.*; *cf. Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 279

---

[6] Comer has not directed the Court to anything in the evidentiary record from which the Court could conclude that TEA created its neutrality policy purposefully to promote or endorse a particular religion.

No. 09-50401

(5th Cir. 1996) (reasoning that a "statute's effect is to advance religion [when] . . . it gives a preferential, exceptional benefit to religion that it does not extend to anything else."). "Nonetheless, where the benefit to religion or to a church is no more than indirect, remote, or incidental, the Supreme Court has advised that 'no realistic danger [exists] that the community would think that the [contested government practice] was endorsing religion or any particular creed.'" *Freiler*, 185 F.3d at 346 (quoting *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 395 (1993)).

Upon review of the record and applicable law, we cannot conclude that TEA's neutrality policy has the "primary effect" of advancing religion. The fact that Comer and other TEA employees cannot speak out for or against possible subjects to be included in the curriculum—whether the considered subjects relate to the study of mathematics, Islamic art, creationism, chemistry, or the history of the Christian Crusades—their silence does not primarily advance religion, but rather, serves to preserve TEA's administrative role in facilitating the curriculum review process for the Board. That is, we have before us no evidence that ordinary Texas citizens look to TEA employees for authoritative statements on what the fifteen elected Board members might or may not one day endorse. Common sense dictates that Texas citizens would look to the fifteen Board members they elected, and not the TEA staff hired to work for the Board. And appropriately so, since TEA's sole role during the curriculum development process is to facilitate the curriculum review meetings, provide resources for the Board's advisors, and accurately draft and neutrally compile all of the recommendations to the Board and the Board's resulting decisions.

11

No. 09-50401

Thus, we find it hard to imagine circumstances in which a TEA employee's inability to publicly speak out for or against a potential subject for the Texas curriculum would be construed or perceived as the State's endorsement of a particular religion. Comer has presented no evidence that disputes the district court's conclusion in this regard, and accordingly, we find "no realistic danger . . . that the community would think that [TEA's neutrality policy] . . . [i]s endorsing religion or any particular creed." *Freiler*, 185 F.3d at 346. We find that TEA's neutrality policy does not violate *Lemon*'s second prong.[7]

## CONCLUSION

For the aforementioned reasons, we conclude that TEA's neutrality policy does not violate the Establishment Clause of the First Amendment. Accordingly, the decision of the district court is AFFIRMED.

---

[7] Noticeably absent from the present case are the common elements that ordinarily implicate a violation of the Establishment Clause. In First Amendment constitutional jurisprudence, TEA's neutrality policy is much more akin to a policy regulating speech than a policy advancing any specific religion. We note that the First Amendment's Free Speech Clause protects public employees who exercise their free speech rights. *See Garcetti v. Ceballos*, 547 U.S. 410, 413 (2006) ("It is well settled that a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression."); *Charles v. Grief*, 522 F.3d 508, 511 (5th Cir. 2008) ("Terminating an employee for engaging in protected speech . . . is an objectively unreasonable violation of such an employee's First Amendment rights."). As a public employee, Comer's "speech is protected by the First Amendment when [her] interests . . . 'as a citizen commenting upon matters of public concern' outweigh the interests of the state 'as an employer, in promoting the efficiency of the services it performs through its employees.'" *Charles*, 522 F.3d at 512 (quoting *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 692 (5th Cir. 2007)). Comer, however, has raised no free speech claims, and consequently, we decline the occasion to surmise her chances of succeeding on claims she has not raised.