# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 18, 2011

No. 10-30853

Lyle W. Cayce
Clerk

GERALD T. (JAY) HENNINGS, JR.,

Plaintiff – Appellant

v.

CDI CORPORATION,

Defendant – Appellee

Appeal from the United States District Court
for the Middle District of Louisiana
No. 3:08-CV-271

Before SMITH, SOUTHWICK, and GRAVES, Circuit Judges.

PER CURIAM:[*]

## FACTS AND PROCEDURAL HISTORY

Gerald T. Hennings, Jr. ("Hennings"), was employed by CDI Corporation ("CDI")[1] at its Baton Rouge, Louisiana office until January 2008.   While

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] CDI Corporation is a multi-branch professional services company that offers engineering services, technology outsourcing solutions and professional staffing to various customers.  CDI's Baton Rouge, Louisiana branch services customers such as Shell and Georgia Gulf Chemicals.

No. 10-30853

employed at CDI, Hennings served as the Director of Business Development. Hennings's immediate supervisor, Paul Hough, was the then Vice President of Operations at the Baton Rouge office. In August 2007, Hough left CDI, leaving the Vice President of Operations position open. While CDI was looking for Hough's replacement, Hennings served as both Director of Business Development and Interim Vice President of Operations.[2] As Director of Business Development, Hennings's duties included "represent[ing] CDI in the designated markets to promote and sell [its] services . . . and [] maintain[ing] high level contacts with current customers to ensure that [CDI] meet[s] customer needs and expectations allowing retention of key accounts."

While Hennings was employed at CDI, he participated in four employee incentive plans.[3] In early 2004, Hennings was given a contract titled "CDI Solutions 2004 Business Development Executive Commission Plan" ("2004 Plan"). According to the 2004 Plan, Hennings would "receive commissions based on Direct Margin for all accounts that you directly sell resulting in an executed contract . . . . Commissions will be paid on a monthly basis, within approximately 45 days following [the] month['s] end." The 2004 Plan also contained a reservation of rights provision that provided:

> [i]f you have any issues regarding monthly incentive payments, they must be summarized in writing and submitted to the applicable Branch or Area Manager within 30 days of the payment date. All claims must then be forwarded to the Vice President of Compensation and Benefits for review and resolution. All

---

[2] In late 2007, CDI hired Ray Crichton to take over full-time as the Vice President of Operations. R. 694.

[3] CDI's incentive plans are purported "to recognize and reward key employees [] who contribute to the overall financial performance of their area, business unit, and Company. By rewarding the successful achievement . . . , CDI provides competitive opportunity to enrich your annual cash compensation while driving the behaviors needed to enhance Company performance." Essentially, these plans provide "bonuses" based on a percentage of the amount of the specific contracts sold.

No. 10-30853

subsequent determinations by CDI Executive Management are final.

CDI Executive Management reserves the right to amend the terms of this plan or make other adjustments as necessary to respond to specific business conditions.

Before signing the 2004 Plan, Hennings asked Hough what the "reservation of rights" provision meant. Hough explained,

I indicated to Mr. Hennings that CDI had not provided to me a list of conditions that was meant to be included in the "specific business conditions" phrase. I also indicated that CDI had not provided any explanation or guidance regarding the meaning of this phrase. However, I did indicate to Mr. Hennings that it was my belief that if there was some major company-wide problem, such as not meeting any of the objectives in its annual plan, then CDI would consider that as a condition it might use to modify the 2004 Commission Plan.

On February 27, 2004, Hennings signed the 2004 Plan. Despite the terms of the 2004 Plan, Hennings did not receive any commission payments on a monthly basis. Richard Giannone[4] testified that Hennings was not entitled to the commission payments on a monthly basis. Instead, Hennings was entitled to a lump sum payment on the payout date following the end of the year. Hennings continued to work for CDI without objection. On April 29, 2005, Hennings received a lump sum payment of $13,812.00 under the terms of the 2004 Plan.

On November 29, 2005, Hennings signed another contract, "CDI Solutions 2005 Business Development Executive Commission Plan" ("2005 Plan"), which was similar to the 2004 Plan. The 2005 Plan contained the same provisions as the 2004 Plan, including the express reservation of the right to modify the 2005

---

[4] Richard Giannone was the Executive Vice President of CDI in Baton Rouge, Louisiana.

3

No. 10-30853

Plan and instructions on how to address any issues or complaints dealing with the 2005 Plan.

On February 22, 2006, Hennings submitted to Hough a report containing his calculations of the commission payments that CDI owed to him. These calculations included payments for the second twelve-month period of contracts lasting longer than two years from the 2004 Plan[5] and commission payments from the 2005 Plan. Hough forwarded Hennings's calculations and concerns to his supervisor, Senior Vice President of the Process and Industrial Division Keith Clauss. Hough noted to Clauss, "whom ever decided to use [these percentages] really cost the company a lot of money. The plan itself is not that bad[,] but to give sales persons 6% and 3% of all D[irect] M[argin] for the sale is crazy. . . . At least we won't be dealing with these inequities next year."

Based on these "inequities," CDI decided to amend the commission payment provision. Ultimately, CDI reduced the commission payments for all employees at the Baton Rouge office by fifteen percent. Based on the percentage reduction, Hennings received a total of $110,267.00,[6] which represented eighty-five percent of the amount claimed by Hennings under the 2005 Plan. Giannone testified that the 2005 Plan's payment provision was amended to respond to "specific business conditions;" namely, because the Baton Rouge office had failed to generate enough profit to justify or support the claimed commission payments. By Giannone's calculations, the claimed commissions for the entire Baton Rouge office[7] would have been more than fifteen percent of what that office brought in

---

[5] CDI's 2004 Plan included a "transition pay plan" which consisted of commission payments based upon a particular formula set out in the plan.

[6] This amount represents roughly forty percent of the total amount of commissions paid to the Baton Rouge branch.

[7] CDI employed over 300 people at the Baton Rouge office, including administrative executives, management and sales persons.

that year.  In fact, of the $1,759,000.00 that the Baton Rouge branch brought in, CDI paid out $269,681.00 in bonuses to Baton Rouge employees.

After Hennings received his reduced payment, he sent a detailed letter to Hough regarding the fifteen percent reduction.  However, Hennings was unsure whether his letter was forwarded to the Vice President of Compensation, as required by the terms of the plan.  Without following up on his letter, Hennings continued to work for CDI.

By early 2006, Hennings learned that CDI was going to reevaluate the structure of its incentive plan.  Hennings was advised that CDI was changing its incentive plan to a purely discretionary plan.  At a dinner meeting for CDI management, Giannone advised Hennings multiple times that there would be no carryover payments from the 2005 Plan because the 2005 Plan was being replaced by the 2006 Plan.  The terms of the 2006 Plan make this clear: "[w]hile you are a participant of this Plan, you cannot participate in any other bonus program in CDI."  Giannone claimed that this provision eliminated any obligation CDI owed to Hennings under the 2005 Plan.  In February 2006, Hennings sent Giannone an electronic mail stating that he realized the 2006 Plan would be different and that he included the carryover amount in his commission payment calculations as a "reference" and would delete them from the calculations if necessary.  Months later, after numerous electronic mail discussions concerning whether or not there was any carryover from the 2005 Plan, Hennings signed the "CDI Engineering Solutions Discretionary Bonus Plan" ("2006 Plan") on December 12, 2006.

The 2006 Plan provides, "[s]ince this is a Discretionary program there is no guarantee that a reward will be paid out."  Under the terms of the 2006 Plan, employees would not receive their discretionary payment until April 2007.  However, if the employee's employment with the company ended before the payment date, the employee would not receive any payment.  In April 2007,

No. 10-30853

Hennings received a bonus payment of $25,000.00. Giannone testified, "[t]his payment did not include any carryover under the 2005 Incentive Plan; but did take into consideration the work performed by [Hennings] prior to 2006."

Shortly after receiving payment under the 2006 Plan, Hennings executed another incentive plan contract titled 2007 Regional Sales Director Incentive Plan ("2007 Plan"). The 2007 Plan included a payout date for April 2008, but stated:

> [s]ubject to termination provisions below, you must be employed by CDI on the day of incentive payouts to be considered for a[n] incentive award.
>
> If you resign or are terminated by the company for cause on or before the day of incentive payment, you will not be eligible to receive an incentive award.
>
> If your employment with the company ends on or before June 30, 2007, you will not be eligible to receive an incentive award for 2007.
>
> If your employment with the company terminates due to retirement, long-term disability, death or job elimination by the company after June 30, 2007, an incentive payment will be made considering your accomplishments and the proportional time of service.

On December 22, 2007, Hennings notified Crichton that he had decided to "retire" from CDI and that his last day of employment would be January 13, 2008. On December 26, 2007, Hennings accepted an offer of employment with Excel. During Hennings's exit interview with CDI, Hennings stated that he decided to leave CDI for a "[b]etter [o]pportunity. Advancing to V[ice] P[resident] of Excel, Construction Maintenance [C]ompany." Hennings also indicated that his new position at Excel would offer a higher salary, more benefits, and more responsibility. CDI claimed that Hennings did not "retire," but instead "voluntarily resigned to start a new job." Because CDI determined

6

that Hennings "voluntarily resigned" before the April 2008 payout date, CDI did not make any bonus payments to Hennings under the 2007 Plan.

Hennings sued CDI in state court, and CDI removed to federal court based on diversity of citizenship. Hennings claimed that based on his participation in CDI's employee incentive plans, he was entitled to certain compensation that he was wrongfully denied.

CDI filed its motion for summary judgment. Hennings filed his motion for partial summary judgment. The district court found that the 2006 Plan constituted "a novation of all prior incentive plans and the facts and circumstances of this case indicate that the plaintiff consented to this novation as a matter of law." The district court further found that Hennings's claim for commission payments under the 2007 Plan was without merit because the 2007 Plan was purely discretionary. Based on its findings, the district court granted CDI's motion for summary judgment and denied Hennings's motion for partial summary judgment. Hennings timely appealed.

## STANDARD OF REVIEW

This court reviews the district court's grant of summary judgment *de novo*, applying the same legal standard as the district court. *Comer v. Scott*, 610 F.3d 929, 933 (5th Cir. 2010). Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). In determining whether a fact issue exists, "the court must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Comer*, 610 F.3d at 933 (quoting *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001)). Furthermore, "if any ambiguity exists in a contract, a fact issue remains regarding the parties" intent, thus precluding a

grant of summary judgment. *Millennium Petrochemicals, Inc. v. Brown & Root Holdings, Inc.*, 390 F.3d 336, 340 (5th Cir. 2004).

## DISCUSSION

On appeal, Hennings takes issue with the district court's grant of summary judgment in favor of CDI. Specifically, Hennings contends that the district court erred in granting summary judgment because a genuine issue of material fact exists as to: (1) whether the 2006 Plan constituted a novation; (2) the meaning of the phrase "specific business conditions" under the 2004 and 2005 incentive plans; (3) whether CDI's withholding a portion of the commission payments under the 2004 and 2005 Plans was an abuse of right; and (4) the meaning of the phrase "you will receive discretionary payouts" under the 2007 Discretionary Plan. Because we conclude that the 2006 Plan constituted a novation, we will begin by addressing Hennings's first and third assignments of error.

I.  *Whether the district court erred in granting summary judgment when it determined that the 2006 Plan constituted a novation of the 2004 and 2005 Plans.*

A "novation is the extinguishment of an existing obligation by the substitution of a new one." LA. CIV. CODE ANN. art. 1879. "It is foundational, then, that for a novation to even occur, there must be an existing obligation for the new one to replace." *Langhoff Properties, LLC v. BP Products North America, Inc.*, 519 F.3d 256, 261 (5th Cir. 2008). "An obligation is a legal relationship whereby a person, called the obligor, is bound to render a performance in favor of another, called the obligee. Performance may consist of giving, doing, or not doing something." LA. CIV. CODE ANN. art. 1756.

Moreover, the intentions of the parties "to extinguish the original obligation must be clear and unequivocal. Novation may not be presumed." LA. CIV. CODE ANN. art. 1880. The burden of establishing that a novation has

occurred is on the party who claims it. *Langhoff*, 519 F.3d at 262 (citing *Placid Oil Co. v. Taylor*, 325 So. 2d 313, 316 (La. Ct. App. 1976)). The intention to novate may be shown by the character of the transaction, and by the facts and circumstances surrounding it, as well as the terms of the agreement itself. *Placid Oil Co.*, 325 So. 2d at 316.

In this case, the district court noted that the determining factor in deciding whether a novation had occurred is the intent of the parties. Pursuant to *Fletcher v. Tri-State Mill Supply Co., Inc.*, 609 F. Supp. 150 (M.D. La. 1985), the district court found that Hennings's acceptance of payments under the 2006 Plan for one year constituted consent to extinguish the obligations of the 2004 and 2005 Plans and, therefore, Hennings's actions created a novation. The district court found that the 2006 Plan was intended as a novation of all prior incentive plans and that the facts and circumstances indicated that Hennings had consented to the novation as a matter of law.

Hennings alleges that the district court erred because an obligation must exist in order to be the subject of a novation, and that no obligation existed at the time of the alleged novation. Accordingly, Hennings claims a novation could not have occurred because the obligation under the terms of the 2004 and 2005 Plans had expired on December 31, 2004 and December 31, 2005, respectively, and the obligation of the 2006 Plan did not take effect until January 1, 2006. Hennings relies on *Langhoff*, for the proposition that a novation could not occur when a contract had expired before a new contract took effect. 519 F.3d at 261.

In *Langhoff*, Langhoff had an existing contract for the lease of certain property with the defendant, BP Products ("BP"), that was set to expire on August 14, 1996. *Id.* On August 12, 1996, Langhoff entered into a new contract with Star Enterprise ("Star") that would commence on August 15, 1996. *Id.* This court found that because the lease between Langhoff and BP had expired one day before the new lease began with Star there could be no novation because

there was no obligation existing at the time of the new contract. *Id.* Hennings, therefore, claims that based on *Langhoff*, the 2006 Plan did not constitute a novation because no obligation existed at the time the 2006 Plan took effect.

However, there are two significant differences between *Langhoff* and this case. First, in *Langhoff,* the plaintiff argued that the old lease had expired before the new lease took effect. In this case, Hennings argued at trial that the 2004 and 2005 Plans were still in effect at the time the 2006 Plan was adopted. It is only now, on appeal, that Hennings claims that the 2004 and 2005 Plans had expired before the 2006 Plan commenced. Generally, arguments not raised in the district court are waived. *See*, *e.g.*, *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 317 (5th Cir. 2002). We will consider an issue for the first time on appeal only if "extraordinary circumstances" exist. *Id.* "We will not allow parties to raise issues for the first time on appeal because they believe that they might prevail if given the opportunity to try the case again on a different theory." *Joslyn Mfg. Co. v. Koppers Co., Inc.*, 40 F.3d 750, 759 (5th Cir. 1994) (citing *Holiday Inns, Inc. v. Alberding*, 683 F.2d 931, 934 (5th Cir. 1982)).

Secondly, in *Langhoff*, the lessor was not told that the new lease provisions would replace the old provisions in the old lease. Unlike *Langhoff*, Hennings was explicitly told that the 2006 Plan replaced the 2004 and 2005 Plans, and that there would be no carryover of commission payments from either of the old plans. Thus, Hennings was specifically advised and understood that the 2006 Plan replaced the 2004 and 2005 Plans, and that there would be no carryover of the amounts remaining from the old plans when he signed the 2006 Plan.

Viewing the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party, the 2006 Plan was a novation of all prior incentive plans. *Comer*, 610 F.3d at 933. The district court's reliance on *Fletcher* is well placed. In *Fletcher*, the plaintiff signed a contract on March 29, 1982,

stating that he would be paid on a commission basis. *Fletcher*, 609 F. Supp. at 152. Subsequently, Fletcher and his employer, Tri-State Mill Supply Co., Inc. ("Tri-State"), agreed to pay Fletcher $1,800.00 per month beginning on June 1, 1982. *Id.* The district court found that this agreement "clearly indicate[d] that the parties intended to extinguish all obligations of Tri-State under the commission contract of March 29, 1982, and to substitute a new employment contract in its place." *Fletcher*, 609 F. Supp. at 155. Importantly, *Fletcher* found that the plaintiff's acceptance of payment under the new contract constituted consent to the new compensation plan. *Id.*

Like *Fletcher*, the facts and circumstances surrounding the agreement between Hennings and CDI clearly indicate that the parties intended the 2006 Plan to be a novation of all previous plans. Here, Hennings was aware that CDI was going to create a discretionary plan in 2006. Giannone testified that he held a dinner meeting in January 2006 where "Hennings was asking this question about the carry-forward payment under his Commission Plan, and I told him there was none." Hennings persisted in questioning Giannone about the carry-forward payment, so Giannone ended the conversation by telling Hennings "you know, if your performance is good in '06 because of what you've done in '05, then your discretionary payout would reflect that." *Id.* Despite Hennings's persistent questioning early in the year, he subsequently signed the 2006 Plan, agreeing to discretionary payments excluding any carryover from previous plans. Furthermore, Hennings accepted payment of $13,812.00 under the 2004 Plan and $110,267.00 under the 2005 Plan. In April 2007, Hennings accepted a payment of $25,000 under the terms of the 2006 Plan. Giannone claims that the April 2007 payment did not include any amount of carryover under the 2005 Plan, but did take into consideration the work performed by Hennings prior to 2006. Hennings also "signed a purely discretionary plan in 2007 without any threat to resign if he did not receive commissions due under prior incentive

plans." According to *Fletcher*, Hennings's acceptance of the April 2007 payment indicates his acceptance of the terms of the 2006 Plan and, therefore, constitutes a novation. *See Fletcher*, 609 F. Supp. at 155 (finding that plaintiff's agreement to and acceptance of payment under new contract constituted a novation).

Hennings further argues that "[if] a substantial part of the original performance is still owed, there is no novation." *See* LA. CIV. CODE ANN. art. 1881. Here, Hennings claims that CDI had a continuing obligation to pay the remaining commissions earned under the 2004 and 2005 Plans after the 2006 Plan became effective. Hennings's argument is, however, without merit. Both the 2004 and 2005 Plan reserve the right to amend the terms of the plan or make adjustments as necessary . . . ." Under the 2004 Plan, Hennings accepted payment of $13,812.00. Under the 2005 Plan, Hennings accepted payment of $110,267.00 with the understanding that there would be no carryover of any amounts remaining. Based upon the Baton Rouge office's performance, CDI amended the terms of the plans to provide for payment of eighty-five percent of the claimed commission amounts. Giannone stated that this amendment to the terms was based on the fact that the Baton Rouge office was not producing enough profit to justify the commission payment. Because CDI retained the right to amend the terms of the plans and paid Hennings the amount owed pursuant to the amendment, "a substantial part of the original performance" did not remain. Thus, Hennings's argument is without merit.

Based on the facts and circumstances surrounding the agreements, the parties clearly intended the 2006 Plan to constitute a novation of the prior plans. Therefore, no genuine issue of material fact exists as to whether the 2006 Plan constituted a novation of the prior plans.

In addition, Hennings contends that a genuine issue of material fact exists as to whether CDI's withholding of commission payments under the 2004 and 2005 Plans was an abuse of right. Because the 2006 Plan constituted a novation,

extinguishing the obligations arising from the 2004 and 2005 Plans, we do not reach the merits of this argument. Accordingly, the district court did not err in finding the 2006 Plan to be a novation.

II.   *Whether the district court erred in granting summary judgment when it determined that "local office performance" was included in the meaning of the phrase "specific business conditions."*

Under the 2004 and 2005 Plans, CDI reserved the right to amend the terms of the plans or make other adjustments as necessary to respond to "specific business conditions." Hennings contends that because his understanding of the meaning "specific business conditions" differed from that of CDI this court should resolve the meaning in his favor. *See* LA. CIV. CODE ANN. art. 2056 (2010). Hennings claims he understood the phrase "specific business conditions" to include "major company-wide conditions," and only after Hough indicated such did he sign the 2004 Plan. Hennings contends that Hough had the apparent authority to interpret the terms of the 2004 Plan as such and, therefore, a genuine issue of material fact exists as to whether CDI is bound by Hough's representation of the meaning of "specific business condition."

We have held that where an employer exercises rights reserved in the contract there can be no breach of contract. *Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 188 (5th Cir. 2005) (plaintiff cannot prove employer breached contract when employer exercising rights reserved in contract's plain language).

Here, Hennings's reading of the contract and his understanding of Hough's interpretation are too narrow. The record clearly indicates that CDI did not want to be limited to a specific set of business conditions in order to reserve its right to amend the terms of the 2004 Plan. As noted by the district court, "[i]t would not be feasible for CDI to imagine every business condition where it would need to alter the terms of the plan." The language granting CDI such broad discretion to amend the terms of the contract is clear and explicit: "CDI

No. 10-30853

Executive Management reserves the right to amend the terms of this plan or make other adjustments as necessary to respond to specific business conditions." In *Nichols*, whether or not each term of the contract was defined was of little import; rather, this court was concerned with the contract language explicitly reserving the right to amend the terms of the contract. 485 F.3d at 188.

Moreover, Hennings's allegation that "[o]nly after Mr. Hough indicated it was his understanding this phrase was only meant to include major company-wide conditions did [Hennings] execute the 2004 [] Plan," is without merit. A careful reading of the record shows that Hough did not interpret the meaning of the phrase as Hennings contends. Hough stated,

> I indicated to Mr. Hennings that CDI had not provided to me a list of conditions that was meant to be included in the "specific business conditions" phrase. I also indicated that CDI had not provided any explanation or guidance regarding the meaning of this phrase. However, I did indicate to Mr. Hennings that it was my belief that if there was some major company-wide problem, such as not meeting any of the objectives in its annual plan, then CDI would consider that as a condition it might use to modify the 2004 Commission Plan.

Clearly, Hough did not interpret the phrase "specific business condition" to include only "major company-wide conditions." The fact that CDI used broad language, thereby not limiting itself to a specific set of business conditions, is evinced by Hough's explicit statement that CDI did not provide a list of conditions to be included in the phrase, and did not provide any explanation as to the meaning of this phrase.

In addition, Hough stated that "it was his belief" that if there was a company-wide problem CDI would consider amending the plan, not that it was the company's belief or CDI's belief. Hough also stated, in referring to "major company-wide condition," that "CDI would consider that as *a* condition it *might* use to modify the 2004 Plan." (emphasis added). Moreover, if Hough or CDI had

14

intended the phrase "specific business conditions" to be limited to only major company-wide conditions then CDI could have just as easily written the provision to include "major company-wide conditions" instead of "specific business conditions."

Despite Hennings's argument, no genuine issue of material fact exists as to the meaning of the phrase "specific business condition."

### III. *Whether a genuine issue of material fact exists as to the meaning of the phrase "you will receive discretionary payouts" under the 2007 Discretionary Plan?*

In Hennings's final issue on appeal, he alleges that a genuine issue of material fact exists as to the parties' intent regarding the meaning of the phrase "you will receive discretionary payouts." Hennings takes issue with the 2007 Plan provision that provides, "[y]ou will receive discretionary payouts based on accomplishments in the plan year relative to your assigned accounts and/or your regional top line performance." Hennings emphasizes the phrase "will receive" in his brief to this court, arguing that if Hennings was eligible to participate in the 2007 Plan, CDI would be obligated to give Hennings a performance-based payment for his work in 2007. To be eligible to receive a discretionary bonus payment, the plan provided:

> Subject to termination provisions below, you must be employed by CDI on the day of incentive payouts to be considered for a[n] incentive award.

> If you resign or are terminated by the company for cause on or before the day of incentive payment, you will not be eligible to receive an incentive award.

> If your employment with the company ends on or before June 30, 2007, you will not be eligible to receive an incentive award for 2007.

> If your employment with the company terminates due to retirement, long-term disability, death or job elimination by the

15

company after June 30, 2007, an incentive payment will be made considering your accomplishments and the proportional time of service.

The plan further provided that "2007 incentive awards are scheduled for payout in April 2008, subject to completion of CDI's audited year end financial statements." Hennings claimed, however, that he "retired" in January 2008. CDI claims that Hennings did not "retire," but voluntarily resigned from CDI because he negotiated employment with Excel before leaving CDI and began work at Excel in mid-January 2008, only a few weeks after leaving CDI.

The district court found that although CDI did not have specific guidelines which set forth the requirements necessary to constitute a "retirement," Hennings's claim for a commission bonus under the 2007 Plan was purely discretionary. By its terms, the 2007 Plan provided for purely discretionary payments. Relying on *Cornet v. Cahn Electric Co., Inc.*, 434 So. 2d 1052, 1056 (La. 1983), the district court found that an employer is not obligated to pay its employees a gratuitous bonus. In *Cornet*, Cahn Electric Company ("Cahn") developed an optional incentive plan to encourage employees to remain with the company until retirement. Cahn Electric's principal motive behind the optional incentive plan was to encourage continued employment through retirement by promising an additional retirement benefit. Like Hennings, because Cornet voluntarily terminated his employment before retirement, "it was he who prevented fulfillment of the principal motive of the plan." *Id.*

Additionally, the *Cornet* court distinguished the payments made in *Cahn* from those in *Morse v. J. Ray McDermott & Co., Inc.*, 344 So. 2d 1353 (La. 1977). In *Morse*, the court stated that the payments "were in the nature of delayed compensation, or pay for performed services during the period for which each contribution [to the reserve] was made." *Id.* at 1368. Unlike *Morse*, the payments to be made by CDI under the 2007 Plan could not be considered

delayed payments for services already performed.  Under the 2007 Plan, the payments were discretionary by the plan's terms and did not automatically accrue throughout the year for services performed.  Like *Cornet*, however, CDI developed the optional 2007 Plan, which encouraged employees to work hard and stay with the company until retirement, and in return the employees may receive a commission bonus.  These commission bonuses under the 2007 Plan were discretionary and, therefore, constitute gratuitous bonuses.  Furthermore, a plain reading of the phrase at issue explicitly shows the payment is discretionary and, thus, not mandatory as Hennings contends.  Therefore, we find that no genuine issue of material fact exists as to the meaning of the phrase "you will receive discretionary payouts."

## CONCLUSION

For the foregoing reasons, no genuine issue of material fact exists as to any of the plaintiff's assignment of errors.  Therefore, the district court's grant of summary judgment is AFFIRMED.